IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2007

## STATE OF TENNESSEE v. JAMES WESLEY DANIELS

**Direct Appeal from the Circuit Court for Cocke County**
**No. 9356-III     Rex Henry Ogle, Judge**

---

**No. E2006-01119-CCA-R3-CD - Filed September 24, 2007**

---

James Wesley Daniels, the defendant, appeals his convictions for premeditated first degree murder and attempted second degree murder. The defendant asserts as grounds for appeal that: the evidence was insufficient to support the convictions; the trial judge erred in refusing to recuse himself; and the trial court erred in failing to take remedial action after the defendant was observed in restraints by some jury members. We have concluded that no reversible error is present, and we affirm the convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

James R. Hickman, Jr., Sevierville, Tennessee, for the appellant, James Wesley Daniels.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Lisa Mathis testified that on May 31, 2004, she lived in a mobile home at 115 Horn Way in Newport. Charles Adams and Jamie Cox were visiting with Ms. Mathis when the defendant first came to the residence on May 31. Ms. Mathis did not know the defendant. When the defendant saw Cox, the defendant stated, "[W]e have a problem." Ms. Mathis asked the defendant to leave as she held a baseball bat. The defendant replied that he would be back with something more than a stick. According to Ms. Mathis, the defendant and Charles McGaha, the co-defendant, returned that evening at approximately 10:15 p.m. The defendant had a handgun, and McGaha had a rifle. Mathis and Adams were in the living room when the defendant entered the home. Cox, Mike Benson, and David Shults were in a bedroom in the rear of the mobile home. The defendant ignored Mathis' request that he leave and proceeded toward the rear bedroom. Mathis had called 9-1-1 when

McGaha entered. McGaha pointed the rifle at Mathis' head and told her to drop the phone; he then asked her "where the s.o.b. was." Mathis stated that she heard a gunshot; McGaha then went toward the rear bedroom. As Mathis ran to her neighbor's house, she heard another gunshot.

Michael Benson testified that he had gone to Mathis' home with David Shults on the day of the shooting. Benson, Shults, and Cox were in a rear bedroom preparing to smoke cocaine when the defendant came in with a handgun, yelling at Cox. Benson ran outside and hid behind a tree. On his way out, he saw McGaha with a rifle. From his hiding place, Benson heard two gunshots. He saw two cars leave; Benson identified the driver of one car as Shults but could not identify the occupants of the other car. Benson had never seen the defendant or McGaha previously.

Eryn Wilds worked at the Eastport BP in Newport. She testified that she knew the defendant and had seen him twice on May 31. He was at the store the first time at approximately 3:00 - 3:30 p.m. and was there a second time at approximately 10:15 p.m. Ms. Wilds said that the defendant was driving a Subaru and that he was accompanied by another man. The defendant first asked to get gas, but the station was closed. The defendant next asked to borrow five dollars, and she refused. Ms. Wilds stated that the defendant was acting "sort of hyper."

Derrick Woods, a detective for the Cocke County Sheriff's Department, arrived at the scene at approximately 11:00 p.m. Other officers directed him to the bedroom where the deceased Jamie Cox was lying on the floor. A rifle cartridge, 7.62 caliber, was found beside a night stand on the floor. A .40 caliber handgun cartridge was found in the bedding. Detective Woods described observing a bullet hole which went through a pillow, a mattress, and through a wall in the mobile home. Another bullet hole, exiting the trailer, was observed on the left wall. No weapons were recovered. The detective drove three possible routes between the Eastport BP and the Mathis home. In distance and time elapsed, they were measured as follows: route one: 3.27 miles and six minutes, thirteen seconds; route two: 3.76 miles and ten minutes, forty-four seconds; route three: 3.48 miles and eight minutes, forty-two seconds.

Certain stipulations were introduced into the record. The TBI found no evidence of blood in the defendant's Subaru automobile. The deceased was analyzed for alcohol content, and the test results were: blood - .19; urine - .25; vitreous - .21. The toxicology tests reflected that the deceased's blood had marijuana metabolites of 23.3 ng/ml. The urine sample was negative for barbiturates, benzodiazepine, cocaine, and opiates. A white powder substance and plant material were submitted for testing by the TBI. The white powder was negative for controlled substances, and the plant material was identified as marijuana residue.

Kim Fine was the victim's girlfriend at the time of his death. She had previously lived with the defendant. She stated that the defendant had a problem with the victim and had told her four years previously that, if the defendant saw the victim, one of them would die.

Charles Adams stated that he was visiting with Ms. Mathis on May 31. Adams was present when the defendant first came to the home. He heard the defendant tell Mathis that he would return

with something more than a bat.  When the defendant returned a second time, Adams and Mathis were in the living room.  Adams saw the defendant and McGaha arrive and went to the bedroom to warn the victim.  The defendant and McGaha came to the bedroom.  The defendant had a handgun, and McGaha held a rifle.  The defendant fired the handgun; the defendant and the victim then began to wrestle for possession of the gun.  The defendant told McGaha to "shoot this s.o.b."  McGaha shot the victim from a distance of three to five feet, and the victim fell to the floor.  The defendant pointed the pistol at Adams and "acted like" he pulled the trigger but the gun did not fire.  The defendant told McGaha to shoot Adams, but McGaha refused.  As the defendant was leaving the bedroom, he said, "[S]ay it was self defense."  Adams watched the defendant and McGaha leave in a Subaru vehicle.

Dr. Darinka Mileusnic - Polehan, a forensic pathologist, testified concerning the findings of her autopsy of the victim.  The cause of death was a single gunshot that entered the victim's back, perforated his left lung, tore his heart, and exited through his chest.  The residue of the wound indicated that it was a contact wound or was fired from very close range.

The defendant was indicted in a two-count indictment for premeditated first degree murder of James Quinton Cox and attempted premeditated first degree murder of Charles Adams.  The defendant was convicted as charged on the first count and for attempted second degree murder (Class C felony) on the second count.  The trial court imposed sentences of life imprisonment for the premeditated first degree murder conviction and eleven years for the attempted second degree murder; the sentences run concurrently.  The defendant has raised three issues on appeal: 1) the evidence was insufficient to support the convictions; 2) the trial judge erred in refusing to recuse himself after a challenge to his impartiality; and 3) error was committed by failure to take curative action or declare a mistrial after some jury members viewed the defendant handcuffed and shackled.

Sufficiency

The defendant contends that the evidence did not prove premeditation by the defendant and, therefore, was insufficient to support the conviction for first degree murder.  The defendant also challenges the sufficiency of the evidence supporting the conviction for attempted second degree murder.

When reviewing the sufficiency of the evidence, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002); Tenn. R. App. P. 13 (e).  Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to demonstrate why the evidence is insufficient to support the verdict.  See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003).  On appeal, the State is entitled to the strongest legitimate inferences that may be drawn therefrom.  State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000).

A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

First degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1).

Premeditation
is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
T.C.A. § 39-13-202(d).

Whether premeditation existed in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Premeditation involves the defendant's state of mind which often is not susceptible to proof by direct evidence. Thus, premeditation may be proved by circumstantial evidence. See State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Our courts have identified certain circumstances that may warrant a finding or an inference of premeditation. The nonexclusive list includes: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; preparations to conceal the crime before the crime is undertaken; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing. See Bland, 958 S.W.2d at 660; State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). A defendant's failure to render aid to the victim is another circumstance probative of premeditation. State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The record in this case contains numerous circumstances from which the jury could have inferred the defendant acted with premeditation in killing the victim. Kathy Fine, who had been a girlfriend of both the defendant and the victim, testified that the defendant said if he encountered the victim, one of them would die. When asked to leave her home by a bat-wielding Lisa Mathis, the defendant stated his intent to return with something bigger than a bat. In fact, the defendant did return, armed with a handgun and accompanied by McGaha, who was armed with a rifle. According to Adams' eyewitness account of the defendant's actions, "he shot it and when he shot it him and James got into a quarrel and started wrestling. Then Charlie come in." While struggling with the unarmed victim, the defendant ordered McGaha to shoot the victim. McGaha complied, and his shot

-4-

proved to be fatal. The defendant did not attempt to offer aid to the victim but, instead, turned his gun on Charles Adams and ordered him to say it was self-defense. Later that night, the defendant spoke with Eryn Wilds, who had known the defendant for four or five years. Ms. Wilds stated that the defendant was somewhat "hyper" but that he was acting "[a]bout the same" as his normal behavior. The weapons used by the defendant and McGaha were never found. The above outlined circumstances justify a finding of premeditation by the jury. Although the fatal shot was fired by McGaha, the jury was instructed on the law of criminal responsibility.

The defendant also contends that the evidence did not support any attempt on his part to kill Charles Adams. The defendant was convicted of attempted second degree murder.

Second degree murder is a knowing killing of another. T.C.A. § 39-13-210(a)(1).

Criminal attempt is statutorily defined as follows:
(a)   A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
    (1)   Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
    (2)   Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
    (3)   Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
(b)   Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.
T.C.A. § 39-12-101.

The defendant contends that Charles Adams' testimony as to his attempted murder was too ambiguous to constitute an attempt. Adams' pertinent testimony was as follows: "He pointed a pistol at me and acted like he pulled the trigger and then when he was getting ready to leave he said say it was self defense." There had been testimony by Adams that the defendant's pistol had previously made a clicking noise as if it had jammed. The jury could reasonably infer that the pistol's malfunction prevented Adams from being shot. Such an inference is supported by the defendant's order to McGaha to shoot Adams. These circumstances strongly support the conviction for the attempted second degree murder of Adams.

## Failure to Recuse

In his next issue, the defendant asserts that the trial judge erred in failing to recuse himself after his impartiality was challenged. The State counters that this issue was waived by the defendant's failure to include it in the motion for a new trial. After review, we agree that the issue was waived pursuant to Tennessee Rule of Appellate Procedure 3(e).

During the sentencing phase of the trial, the defendant's counsel brought the matter to the court's attention. An unidentified male claimed to have seen the trial judge in conversation with a Mr. Hicks, the victim's half-brother. The conversation was alleged to have occurred on the stairway and continued as Mr. Hicks and the judge went to a vehicle and then returned. The trial judge denied having any conversation with Mr. Hicks. Hicks also denied any conversation with the judge other than to say good morning. The trial judge characterized the allegations as unfounded and resumed the sentencing hearing.

> Tennessee Rule of Appellate Procedure 3(e) provides:
> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Despite this failure, this court has authority to review the record for errors to prevent needless litigation, injury to the interest of the public, and prejudice to the judicial process, pursuant to Tennessee Rule of Appellate Procedure 13(b). It is within our discretion to take notice of an error that affects a substantial right of an accused even though omitted in the motion for a new trial. Tenn. R. Crim. Proc. 52.

We have reviewed the arguments of the defendant concerning this issue, and we choose to forego this discretionary power. The issue of the trial judge's failure to recuse himself is deemed waived.

## Prejudice to Defendant

In his final issue, the defendant alleges error by the trial court's failure to take curative action after some jury members observed the defendant being brought to court handcuffed and shackled.

On the morning of the second day of this two-day trial, defense counsel informed the trial judge, outside the jury's presence, that some jury members had observed the defendant being brought into the courtroom in handcuffs and shackles. The following exchange then ensued between the judge and defense counsel:

COURT:      Okay, now let me ask you this, and certainly this is a very legitimate concern, but if we . . If I . . You know if you request me to bring that to the jury's attention, I certainly feel honor bound certainly to do that. But I think, and it's just my observation, that if you draw attention, further attention to it . . Now granted, hopefully that never happens in any case but when it does then the attorneys and their clients have to decide whether they want the Court to deal with that. If either of you ask me to do that I will but it's just . . You know.

COUNSEL:    I'm not asking the Court to make a curative instruction, as I agree with you. I think that draws more attention than now. But if it's something that can be avoided in the future, certainly that's something I need to bring to the Court's attention, that should be.

COURT:      Certainly I would ask the deputies to do their very best to avoid that, Officer Holt, and to deal with that.

As a cautionary note, we observe that the defendant has invited waiver of this issue by failing to cite to authority to support his argument. See Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). Nevertheless, we will consider the issue on its merits.

This was not a case in which the defendant was restrained during the trial. There exists a legal presumption against such restraints during trial and places the burden on the State to demonstrate a clear showing of necessity. Willocks v. State, 546 S.W.2d 819, 821 (Tenn. Crim. App. 1976). The jurors who witnessed the defendant in restraints in this case did so during his transfer to the courtroom. We have previously ruled that such incidental sightings are non-prejudicial within the context of the circumstances. State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987). In doing so, we stated that "[c]ommon sense must prevail in such instances where a jury or jurors inadvertently see a defendant dressed in prison clothing. Reason dictates that they must know a person on trial is either on bail or in confinement during the court of a trial." Id. (The defendant in Baker was also in restraints.)

Furthermore, the record reveals that the trial court offered to give a curative instruction to the jury. The offer was specifically rejected by the defendant. The defendant cannot now complain for the trial court acceding to his request. See Tenn. R. App. P. 36(a). Accordingly, we conclude that this issue presents no error by the trial court.

CONCLUSION

After review of the record, we have concluded that: the evidence supports the convictions beyond a reasonable doubt; the defendant waived the issue as to recusal by the trial judge; and the

defendant has not demonstrated undue prejudice due to jury members inadvertently observing the defendant in restraints.  For the foregoing reasons, we affirm the convictions.

_____
JOHN EVERETT WILLIAMS, JUDGE