# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville October 15, 2013

## STATE OF TENNESSEE v. WESLEY M. GIFFORD, JR.

**Appeal from the Circuit Court for Marion County**
**No. 8923    Thomas W. Graham, Judge**

---

**No. M2013-00253-CCA-R3-CD - Filed January 30, 2014**

---

The Defendant, Wesley M. Gifford, Jr., was convicted by a jury of attempted aggravated burglary, telephone harassment, and indecent exposure. Following a sentencing hearing, the trial court imposed concurrent terms of three years and six months for the attempted aggravated burglary conviction and eleven months and twenty-nine days for the telephone harassment conviction. This effective sentence was also to run consecutively to his prior sentences. In this direct appeal, the Defendant contends that: (1) the trial court erred in failing to grant a mistrial when a witness testified that the Defendant previously had been in jail; (2) the trial court erred in allowing admission of evidence of the Defendant's prior bad act; (3) the trial court erred in not instructing the jury on the issue of alibi; (4) the evidence was insufficient to support his convictions; and (5) cumulative errors entitle him to a new trial.[1] After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. JEFFREY S. BIVINS, J., filed a separate concurring opinion, concurring in the results.

Jeffrey Harmon, District Public Defender, and Norman Lipton, Assistant District Public Defender, Jasper, Tennessee, for the appellant, Wesley M. Gifford, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; J. Michael Taylor, District Attorney General; and Julia Veal, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] For the purposes of brevity and clarity, we have renumbered and combined several of the Defendant's issues.

# OPINION
## FACTUAL BACKGROUND

A Marion County Grand Jury indicted the Defendant on one count of attempted aggravated burglary, one count of telephone harassment, and one count of indecent exposure. See Tenn. Code Ann. §§ 39-12-101, -13-511(b), -14-403, -17-308(a)(1). The Defendant proceeded to a jury trial on October 12, 2011.

Pamela McFalls testified that she and her husband, Roger McFalls, were living in Marion County in 2009. She had known the Defendant and his family for approximately six years. She began noticing a change in the Defendant's behavior toward her soon after she and her husband hired the Defendant to work for their lawn-care service. She testified that the Defendant "started making gestures and stuff when [her] husband wasn't in hearing distance." The Defendant "would lick his lips, stick his tongue out . . . grab hisself [sic], you know, and ask when [they] could be together alone."

Eventually, the Defendant began making phone calls to the McFalls' residence between the hours of 11:00 p.m and 1:00 a.m. Pamela[2] testified as to the content of the phone calls:

> Q: What kind of things would he be saying?
> A: When can I sneak out and meet him. He wanted to be with me. He wanted some of that.
> Q: Is that what he said, or did he use foul language?
> A: Foul language.
> Q: Would you describe it as mildly foul or extremely foul?
> A: Extremely foul. He would like to gore that p---y, because Roger couldn't do it, because he was an old man.

The Defendant made such phone calls "at least three times a week, maybe two times a week on and off" during January and February 2009.

Pamela testified that she was driving with her husband and two daughters when they realized that the Defendant was a passenger in a truck in front of them. When the Defendant saw the family, he began "screaming and hollering" at Pamela and exposed his genitalia toward her through the back window of the truck. Initially, Pamela could not remember the exact date of this previous incident, recalling only that "[i]t was a sunny day, it was warm.

---

[2] Because more than one witness has the same surname, we will refer to these witnesses using their given names. We intend no disrespect.

[They] were just going to the store."  Later in her testimony, she said "the exposure happened a few days before."

Sometime after that incident, on February 23, 2009, Pamela was alone at home when the Defendant came to the sliding glass door.  She testified,

> He was -- just come out from  nowhere -- and was banging on the door screaming.  Called me an F-ing 'B' and that he wanted me, he was going to get me and he kept jerking on the door, jerking on the door to the point where I thought the stick was going to come out, so I run around the side of the couch to the back, and I did reach for the pistol, but I was afraid that it wouldn't go through the glass, it would shoot me, or not go through and he would get in.  I ran to the back and I locked myself in the back, but before I did that, that's when he dropped his drawers and he had a hold of hisself [sic] and started masturbating . . . .  I left the room and hid in the back of the house until my husband got home.

After she locked herself in the back room, Pamela still could hear the Defendant screaming that "[h]e was going to get in.  One way or another he was going to get in."  Eventually, the Defendant stopped banging on the door, and Pamela waited in the back room until Roger came home.  She told Roger what had happened, and he called the police the following morning.  An officer came to the house, and Pamela gave a statement.

On cross-examination, Pamela admitted that she had pled guilty to filing a false police report in 2009.  She also testified that, when the Defendant called her, the number sometimes showed up on her caller ID as "Douglas Brewer," the name of the Defendant's step-father at whose home the Defendant often stayed.  However, the number sometimes showed up as "private caller."  She also stated that the Defendant "was screaming he was going to rape [her]" while he was standing her sliding glass door.  Pamela explained that she did not call the police about the phone calls because she was not scared of the Defendant at that time and "didn't take the phone calls serious [sic][.]"  She admitted that she "made a mistake" not calling the police after the flashing incident in the truck.

Roger McFalls testified that the Defendant is his second cousin.  During the time he employed the Defendant at his lawn-care service, Pamela began requesting not to work around the Defendant.  Although he did not see the Defendant making gestures toward Pamela, he fired the Defendant when he discovered what was happening.

Roger testified, when the Defendant would call the house at night, "Pamela would answer the phone and it would be [the Defendant] on the other end, because she would

immediately hand the phone to me, and I would start to say something, and he would just hang up." He testified that the Defendant used "very foul language" about "what he wanted to do with [Pamela,]" and "[the Defendant] said he was going to screw [Pamela] when he got a chance, and when [Roger] was gone[, the Defendant] would take advantage of the situation[.]"

When Roger left home on February 23, 2009, he saw the Defendant riding a bicycle on a dirt road behind his house. He testified that the Defendant watched him leave. When Roger returned home, "the door was locked, which was kind of strange. [He] opened the door and hollered 'Pamela,' and she did not answer. [He] knew something was bad wrong right then." Eventually, he found Pamela "hunkered down in the bathroom behind the door crying[.]" It took a while to calm her down enough for her to be able to explain what had happened. Roger called the police on February 24, 2009, and an officer came to the house and took a report.

Officer Jonathan Raines of the Marion County Sheriff's Department testified that he was dispatched to the McFalls' residence on February 24, 2009. When he arrived, he interviewed the McFalls about the incident and made a written report. Officer Raines admitted that he did not take any pictures at the scene, nor did he take any fingerprints. He also admitted that he did not interview any other witnesses or the Defendant in connection with the case.

Wanda Smith testified for the defense. She stated that Roger is her brother and that the Defendant is her cousin's son. On at least one occasion around February 2009, she brought the Defendant clothes in Rossville, Georgia. She stated that she knew it was around February because "[i]t was really cool around about then." She testified that, to her knowledge, the Defendant did not own a car and used a bicycle to get around town. When defense counsel asked Smith if Pamela and Roger tell the truth, she responded, "Not all the time." Smith testified that she did not "associate with a lot of people" in the community, but that Roger's reputation in the community was "not good[,]" although she was not sure about his reputation for truthfulness. She did not know about Pamela's reputation for truthfulness in the community.

After Smith's testimony, the defense rested its proof. The defense requested that the court give an alibi instruction to the jury, but the court denied the request. The jury deliberated and found the Defendant guilty as charged. The trial court later sentenced the Defendant to three years and six months for the attempted aggravated burglary, and eleven months and twenty-nine days for the telephone harassment, to be served consecutively to each other, and to the Defendant's previously imposed sentences. A fine of $500 was also

4

imposed on the Defendant's indecent exposure conviction. The Defendant filed a motion for new trial, which the trial court denied. The Defendant then filed a timely notice of appeal.

## ANALYSIS

In this direct appeal, the Defendant raises the following issues: (1) the trial court erred in failing to grant a mistrial; (2) the trial court erred in allowing admission of evidence of the Defendant's prior bad act; (3) the trial court erred in not instructing the jury on the defense of alibi; (4) the evidence was insufficient to support his convictions; and (5) cumulative errors entitle him to a new trial. We will consider each of these issues in turn.

### I. Failure to Declare a Mistrial

The Defendant argues that the trial court erred in denying his motion for a mistrial following Roger's testimony that the Defendant previously had been in jail. The State responds that "the trial court did not abuse its discretion by declining to grant a mistrial due to the unsolicited, extraneous testimony regarding the Defendant's status on work release from jail."

During his direct examination, Roger testified that when the Defendant was employed with his lawn care service, he was "getting [the Defendant] from jail and working him[.]" Defense counsel objected, and the court sustained the objection, instructing the jury to "not consider anything that he said about the [D]efendant's jail status." Following this objection, a bench conference was held in which defense counsel moved for a mistrial. The trial court ultimately denied the motion for a mistrial and read the following curative instruction to the jury:

> So ladies and gentlemen, any kind of past act that an individual has committed generally is -- I mean, most past acts are acts that might be viewed to be detrimental, are not going to be evidence in a case of some other events simply because it causes the jury to be prejudiced against the person who may have had some bad act in their past. So that's why we don't -- if someone had served a misdemeanor sentence or something like that, unrelated in any way to the events, and are not related to truthfulness or anything like that, we don't allow those matters to be thrown in just to make somebody look bad. So sometimes folks work things out, and he didn't know any better, I'm sure, and he brought it out that the [D]efendant had been in jail at the time that they were doing this lawn service. So I'm telling you that you can't consider that, or any way use that against the [D]efendant, but by way of further making it, at least, clear that that shouldn't have anything to do with whether or not he's guilty of the crime charged today, he was in -- it's stipulated and agreed that he was in

5

jail for driving on a revoked license for a few days, so that's the extent of the crime he may have been in jail for.

"The decision of whether to grant or deny a motion for a mistrial rests within the sound discretion of the trial court." State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A mistrial is an extreme remedy that only should be granted "when a trial cannot continue, or a miscarriage of justice would result if it did." State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A trial court's decision to deny a request for a mistrial should not be reversed on appeal absent a clear abuse of discretion. Robinson, 146 S.W.3d at 494. In determining whether a mistrial was warranted, courts should consider the following three factors: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." State v. Nash, 294 S.W.3d 541, 547 (Tenn. 2009).

In the instant case, the State's question preceding the objectionable testimony was regarding how the Defendant's behavior at work had changed. Testimony that the Defendant was in jail, therefore, was unrelated and unresponsive to the question. In fact, the Defendant filed a motion in limine to prohibit any testimony that the Defendant was in jail, and the State agreed to avoid such testimony prior to trial. The record indicates that the State instructed Roger prior to his testimony to avoid mention of the Defendant being in jail. Therefore, although the witness's statement was improper, we conclude that it was unsolicited and unresponsive.

Furthermore, the trial court immediately gave the jury a curative instruction to disregard the answer and not consider it for any purpose. When a trial court gives a curative instruction to disregard a witness's answer, appellate courts "must assume that the jury followed the court's curative instruction." State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994); State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987). Considering the strength of the State's proof based on the direct eyewitness testimony of Pamela and the corroborating testimony of Roger, we conclude that the brief revelation that the Defendant had been in jail is unlikely to have prejudicially affected the jury's verdict. See, e.g., Nash, 294 S.W.3d at 548 (Tenn. 2009) (holding that, in a jury trial for DUI, it was "highly unlikely" that a witness's reference to the defendant's past DUI arrests prejudiced the outcome, in light of the proof); Smith, 893 S.W.2d at 923 (holding that a witness's statement that the defendant "hadn't been too long out of jail" was not prejudicial in light of the proof). Therefore, the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial. Accordingly, the Defendant is entitled to no relief on this basis.

*II. Admission of Defendant's Prior Bad Act*

The Defendant next argues that the trial court erred in admitting Pamela's testimony that the Defendant exposed himself to her through the back window of a truck sometime before the conduct charged in the instant case. The State responds that the trial court did not abuse its discretion because "the evidence was properly admitted to help establish the [D]efendant's intent to have sex" with the victim.

Preliminarily, we note that "[t]he admissibility of evidence is generally within the broad discretion of the trial court . . . [and that] absent an abuse of that discretion, the trial court's decision will not be reversed." State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999) (citing State v. Mcleod, 937 S.W.2d 867, 871 (Tenn. 1996). Admissible proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401, which defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Finally, Rule 404 deals with "character evidence." Subsection (b) of this rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." However, such evidence may be admissible for other purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme." State v. Little, 402 S.W.3d 202, 210 (Tenn. 2013).

In order to determine the admissibility of a prior bad act,

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) the court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). As long as there has been a "substantial compliance" with the procedural requirements of Rule, we review the trial court's ruling under an abuse of discretion standard. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

7

Prior to trial, the Defendant filed a motion in limine to prohibit evidence of the prior exposure or other obscene gestures, arguing the following:

> [T]hese are uncharged and unindicted crimes that are virtually identical in nature to the crimes charged and the probative value of this evidence is substantially outweighed by its prejudicial effect and/or its confusion of issues and, therefore, should be excluded under Rules 403 and 404 of the Tennessee Rules of Evidence.

The trial court held a hearing outside the presence of the jury and heard argument as to the substance of the evidence, its prejudicial nature, and whether it went to the material issue of intent. The trial court ruled that the evidence was admissible, reasoning as follows:

> If [the Defendant] had done that in the past, that comes in, in my judgment, on an issue of, I guess, his propensity to commit this crime and also on just the overall issue of him wanting to get at her in some fashion, if that's the basis of, you know, breaking in, actually going to break in, and the jury thinking it's enough of a crime to charge him with it. I mean, it's a felony offense, and you know, they need to know that he, apparently, was really trying to get in to get to her.
> . . . .
> Well, it shows, though, some kind of a, either a sexual attraction or perversion or something that's caused all this to happen, and the jury can weigh all that out.

While we recognize that the trial court did not state specifically the other material issue involved, we also note that Rule 404(b) only requires such specific findings "upon request." See Tenn. R. Evid. 404(b)(2). The record does not indicate that the Defendant made any such request. As a result, we conclude that the trial court substantially complied with the procedural requirements of Rule 404(b) and proceed with our analysis on an abuse of discretion standard.

We interpret the trial court's ruling to rest on two independent bases: first, that the evidence was admissible to show the Defendant's propensity to commit the crime; and second, that the evidence was admissible to establish the Defendant's intent. Clearly, under Rule 404(b), "evidence of other crimes, wrongs, or acts is not admissible to establish a defendant's propensity to commit the crime for which he or she is on trial." Little, 402 S.W.3d at 210. Therefore, on the first ground, we find that the trial court did err because it applied an incorrect legal standard.

8

Regarding the second basis, that the evidence was admissible to show the Defendant's intent to commit a sexual assault for the purposes of establishing the crime of attempted aggravated burglary, we likewise conclude that the trial court erred. As relevant here, a person commits an aggravated burglary who enters a habitation without consent of the owner "with intent to commit a felony, theft, or assault" therein. Tenn. Code Ann. §§ 39-14-402, -403. For the purpose of establishing the intent element of burglary, "'[o]ne's actions are circumstantial evidence of his intent.'" State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993) (quoting State v. Barker, 642 S.W.2d 735, 737 (Tenn. Crim. App. 1982)). Moreover, "it is within the authority of the jury to infer the defendant's intent . . . from surrounding facts and circumstances." State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010) (quoting State v. Lowry, 667 S.W.2d 52, 57 (Tenn. 1984)); see also State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) ("Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact . . . from all the circumstances of the case in evidence.").

We conclude that Pamela's testimony that the Defendant exposed himself to her on a prior occasion was only marginally relevant to the jury's determination of whether the Defendant had the requisite intent with regard to his attempted entry into the McFalls' residence on February 23, 2009. The prior incident occurred earlier in the month away from the McFalls' residence while Pamela was in a vehicle following a truck occupied by the Defendant. This prior bad act does little to establish the Defendant's intent on the date in question.

Additionally, Pamela testified that, soon after her husband hired the Defendant to work for their lawn care service, the Defendant "started making gestures and stuff and when [her] husband wasn't in hearing distance." She further stated that the Defendant began making phone calls to her residence and provided the jury with testimony of the content of those phone calls, including the Defendant's stated desire to engage in sexual relations with her. Roger testified that the Defendant used "very foul language" during these calls about "what he wanted to do with [Pamela]" and that "[the Defendant] said he was going to screw [Pamela] when he got a chance, and when [Roger] was gone[, the Defendant] would take advantage of the situation." According to Pamela, when the Defendant arrived at her house on February 23, 2009, he told her "that he wanted [her], he was going to get [her.]" As he was "jerking on the door" in an attempt to gain entry, Pamela pointed her gun at him, and then he "drop[ped] his drawers" and began masturbating. On cross-examination, Pamela stated that the Defendant "was screaming he was going to rape [her]" during the episode. This testimony was more than sufficient to provide the jury with evidence of the Defendant's "intent to commit a felony, theft, or assault" once inside McFalls' home. See Tenn. Code Ann. §§ 39-14-402, -403; see also Tenn. R. Evid. 403 (stating that relevant evidence may be

excluded if its probative value is substantially outweighed by the needless presentation of cumulative evidence).

Importantly, we note that the Defendant was also on trial for indecent exposure in addition to the crime of attempted aggravated burglary. The rationale underlying Rule 404 is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005) (citation omitted). The risk is greater when the defendant's other bad acts are similar to the crime for which the defendant is on trial. Id.; see also State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996). Given that the Defendant's prior bad act was the same crime for which he was on trial, i.e, exposing himself, we conclude that the trial court did err in the admission of this evidence because the minimally probative nature of this evidence was outweighed by the danger of its unfair prejudice and its cumulative nature. In any event, the evidence against the Defendant was strong on all counts, and thus, we conclude that the admission of the propensity evidence was harmless. The Defendant is entitled to no relief on this issue.

### III. Jury Instructions

The Defendant argues that "the court erred in failing to charge the jury as to the alibi defense" because the testimony of Wanda Smith "fairly raised" the issue of alibi. The State responds that proof at trial did not fairly raise the issue of alibi.

Generally, the trial court has a duty "to give a complete charge of the law applicable to the facts of the case." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). And, "[w]here the proof fairly raises the issue of alibi, and the proof is supported by credible evidence, the trial court is required to give the instruction of alibi whether requested or not." Moffitt v. State, 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999). Failure to do so is reversible error. Id. However, the trial court has no duty to charge the jury on a defense when it is not "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) ("The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof."); State v. Hatcher, 310 S.W.3d 788, 817 (Tenn. 2010).

In the instant case, Smith testified that sometime around February 2009 she brought the Defendant clothes in Rossville, Georgia. She stated that she knew it was around February because "[i]t was really cool around about then." The trial court ultimately declined to instruct the jury on the issue of alibi, stating, "[T]he case law says that the judge should give the instruction when the defense is fairly raised by the evidence. It would be very hard for me to say it's fairly raised by the kind of testimony we heard from [Smith]. . . . I'm not going

10

to give the charge." We agree with the trial court. Smith's vague testimony that she brought the Defendant clothes sometime around the month that the crime occurred, without more, does not fairly raise the issue of alibi. Accordingly, the Defendant is entitled to no relief on this issue.

*IV. Sufficiency of the Evidence*

The Defendant argues that the evidence is not sufficient to support his convictions of attempted aggravated burglary, indecent exposure, and telephone harassment. The State responds that the evidence is legally sufficient to support the Defendant's convictions.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant's first argument is that Pamela and Roger's credibility was so lacking that the evidence supporting all of his convictions was insufficient. According to the Defendant, "[t]he entirety of the [State's] case was built on testimony of Mr. and Mrs. McFalls[, and] . . . by bringing into question the truthfulness of the McFalls[,] the [Defendant] has created reasonable doubt in the prosecution's case." In support of this

11

assertion, the Defendant notes that Pamela had previously pled guilty to filing a false police report and that Smith testified that "the McFalls did not tell the truth all the time." However, questions concerning the credibility of witnesses are resolved by the trier of fact. See Bland, 958 S.W.2d at 659. Here, the jury chose to accredit some or all of the testimony of Pamela and Roger, and we decline to reassess the credibility of either witness. See State v. McCloud, 310 S.W.3d 851, 867 (Tenn. Crim. App. 2009).

The Defendant also argues that the State failed to prove an essential element of the crime of telephone harassment, in that "there was no evidence that Pamela McFalls was annoyed or harassed by the telephone calls placed by the Defendant." According to the Defendant, "there is no evidence that the Defendant knowingly annoyed or alarmed Mrs. McFalls," and "no evidence that the [Defendant] should have known that he would alarm her" with the statements he made over the phone.

The Defendant was convicted of violating Tennessee Code Annotated section 39-17-308(a)(1), which states,

> (a) A person commits an offense who intentionally:
> (1) Threatens, by telephone, . . . to take action known to be unlawful against any person and by this action knowingly annoys or alarms the recipient[.]

Although Pamela testified that the Defendant's phone calls did not scare her and that she "didn't take the phone calls serious [sic]," the statute does not require that the recipient of the calls be in fear. Rather, the statute requires that the caller "knowingly annoys or alarms the recipient[.]" Tenn. Code Ann. § 39-17-308(a)(1). Pamela and Roger both testified that the Defendant called their residence multiple times per week between January and February 2009. Pamela testified that the calls always came "at night when [they] were in bed" and came as late as 1:00 a.m. She testified that the Defendant used "extremely foul" language and graphically described sexual acts he wanted to perform on her. Roger testified that during the calls, the Defendant used "very foul language," said that "he was going to screw [Pamela] when he got a chance," and asked Roger to "meet [him] somewhere" to "solve this[.]" Pamela and Roger both testified that they asked the Defendant to stop calling. Pamela testified that she threatened to call the police if the Defendant did not stop calling. This testimony clearly was sufficient to lead the jury to conclude that Pamela and Roger were annoyed or alarmed by the Defendant's repeated threatening phone calls.

After considering the evidence in the light most favorable to the State, we conclude that the Defendant has failed to establish that the evidence was insufficient to support his convictions. Accordingly, the Defendant is entitled to no relief on this basis.

*V. Cumulative Error*

Finally, the Defendant argues that cumulative errors committed during his trial entitle him to a new trial on all charges. Under the cumulative error doctrine, our supreme court has stated,

> [T]here may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). Therefore, necessarily, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the proceedings." Id.

As set forth above, we have held that the trial court's only error involved its admission of a prior bad act by the Defendant. This was not "more than one actual error committed in the proceedings." See id. Accordingly, we hold that the Defendant is not entitled to relief on the basis of cumulative error.

CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

13